RECEIVED

MAR - 6 2017 ᑎᑌ᠘

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

ANDREW SCHMIDT

VERSUS

CAL-DIVE INTERNATIONAL,
INC. , ET AL.

CIVIL ACTION NO. 6:15-2526 (LEAD)
*Applicable to All Member Cases*

JUDGE DOHERTY

MAGISTRATE JUDGE WHITEHURST

## <u>MEMORANDUM RULING</u>

Currently pending before the Court are two motions to dismiss pursuant to Fed. R. Civ. P.

12(b)(6) [Doc. Nos. 66, 68] filed by all defendants in these consolidated suits. Pursuant to their

motions, defendants seek dismissal of all claims asserted in this matter. Alternatively, defendants

move the Court to strike the redundant and immaterial portions of plaintiffs' pleadings pursuant to

Fed. R. Civ. P. 12(f). For the following reasons, defendants' motions are GRANTED.

I.      **Factual and Procedural Background**

   A.      **The Schmidt Litigation**

Plaintiff Andrew Schmidt was formerly employed by Cal Dive International, Inc. ("Cal

Dive") as a commercial diver. On April 7, 2010, Mr. Schmidt suffered a brain injury due to

decompression sickness contracted while surfacing from a work-related dive. *Cal Dive Intern., Inc.*

*v. Schmidt*, 639 Fed.Appx. 214, 215 (5th Cir. 2016). On April 19, 2012, Schmidt sued Cal Dive,

alleging the injury left him permanently disabled. *Id.* "Specifically, Schmidt alleged that he suffered

'Type II neurological (cerebral) decompression sickness' and that he was required to remain in a

supine position at nearly all times." *Id.* Schmidt was represented by attorneys Thomas R. Edwards and Joseph W. Walker. Cal Dive filed a counterclaim for reimbursement of maintenance and cure, recission of the employment contract, and damages and attorneys' fees, alleging Schmidt had purposefully and wilfully concealed his medical history from Cal Dive in his employment application and while employed. [Case No. 12-930, Doc. 18, p. 2-3, 5] Trial was scheduled to commence before the Honorable Richard T. Haik on October 21, 2013. [Id. at Doc. 64] On October 15, 2013, six days before trial was scheduled to begin, a settlement conference was held, and Cal Dive and Schmidt agreed to a settlement of all claims. [Id. at 92] On December 12, 2013, Schmidt executed a written Release of all claims. [Case No. 14-3033, Doc. 84, ¶ 51]

**B.    The Cal Dive Litigation**

Post-settlement, Cal Dive continued to surveil Schmidt and collect evidence about the degree of his injury. *Cal Dive* at 215. On October 15, 2014, Cal Dive and Underwriters Severally Subscribing to Lloyd's Policy PE 903008 ("Lloyds")[1] filed suit against Schmidt, Edwards, Walker and the administrators of certain structured settlements.[2] Cal Dive and Lloyds were represented by Kyle Schonekas, Joelle Evans, and Andrea Timpa, of the law firm Schonekas, Evans, McGoey & McEachin, L.L.C. ("the Schonekas Parties"). Essentially, the suit alleged Schmidt committed perjury by making material, fraudulent misrepresentations during the Schmidt litigation, and but for the perjury and fraudulent misrepresentations, Cal Dive and Lloyds would never have entered into the settlement. [Case No. 14-3033, Doc. 1, ¶¶ 33-37] According to Cal Dive and Lloyds' Complaint, in

---

[1] Lloyds was Cal Dive's insurer; Cal Dive and Lloyds each funded a portion of the settlement in the Schmidt litigation. [Case No. 14-3033, Doc. 1, p. 7]

[2] A portion of the settlement funds was distributed in a lump sum, with the remainder to be distributed through a structured settlement. [Doc. 1, p. 17]

the Schmidt litigation, Schmidt and his physicians claimed his condition would never improve and could not be cured, Schmidt spent more that 90% of his day lying down on the couch, Schmidt could no longer drive a car and in order to travel he had to either lie down in the backseat or be transported by ambulance, the slightest amount of physical exertion or exercise caused Schmidt excruciating pain, Schmidt would require eighteen hours per day of attendant care for the next 46.3 years, and Schmidt required power wheelchairs and a van with wheelchair accessibility. [Id. at pp. 4-6] The complaint further alleged that several months after dismissal of the Schmidt suit, Cal Dive obtained surveillance showing Schmidt cutting his grass, driving and jogging for at least two miles, Cal Dive learned Schmidt had obtained a driver's license on December 4, 2013, and Cal Dive learned Schmidt had purchased a new vehicle on December 13, 2013. [Id. at 8]

Cal Dive and Lloyds sought rescission of the settlement agreement, reimbursement of litigation expenses in both the Schmidt and Cal Dive litigation, re-litigation of Schmidt's medical claims and damages, sanctions against Schmidt for bad faith, restitution from Schmidt's counsel of funds paid pursuant to the settlement, and a preliminary injunction prohibiting any further disbursement under the structured settlement to Schmidt or his attorneys. [Id. at Doc. 75, p. 3] The complaint stated Cal Dive and Lloyds "do not believe that Edwards and Walker were aware of Schmidt's fraud," but nonetheless, Edwards and Walker were unjustly enriched without cause. [Id. at Doc. 1, p. 15]

Edwards, Walker and Schmidt each filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to plead fraud with particularity, failure to state a claim for unjust enrichment and/or restitution, and res judicata. On March 4, 2015, Judge Haik granted the motions and dismissed all claims, concluding "Plaintiffs' allegations fail to state a plausible claim that discovery

will lead to the clear and convincing evidence that Schmidt engaged in fraud or other misconduct which prevented Cal Dive from fairly presenting their case." [Id. at Doc. 75, p. 13] On March 13, 2015, Cal Dive and Lloyd's filed a Rule 59(e) motion to amend the trial court's judgment, arguing "it was legal error for the Court to dismiss Cal Dive's suit with prejudice without leave to amend the Complaint to state additional facts to support their claims." [Id. at Doc. 81, p. 1] In support of the motion, Cal Dive and Lloyds submitted a proposed First Supplemental and Amended Complaint; pursuant to Cal Dive and Lloyds' request, the amended pleading was subsequently filed under seal.[3] [Id. at Doc. Nos. 77, 83, 84] In that pleading, Cal Dive and Lloyds added allegations that in November 2013, Schmidt had leased a home that was not handicap accessible; the landlord of that home confirmed he had never seen Schmidt using a wheelchair; the driver's license Schmidt obtained contained no restrictions other than a requirement that Schmidt wear eyeglasses; Schmidt signed a credit application on December 13, 2013, representing that he was employed doing "contract labor" for the prior six months[4]; and Schmidt had not seen any of his treating physicians in the year and a half that had passed since the settlement conference. [Doc. 1, pp. 30-33; *see also* Case No. 14-3033, Doc. 84, pp. 10-12]

On March 19, 2015, counsel for Schmidt sent correspondence to Cal Dive and Lloyds, demanding that certain allegations in the proposed pleading, which plaintiffs contended were false,

---

[3]The First Supplemental and Amended Complaint was filed under seal, because it referred to portions of the Release, which contained the terms of the settlement and was subject to a confidentiality clause. [Case No. 14-3033, Doc. 77, p. 1]

[4]According to Schmidt, Edwards and Walker, Schmidt "remained 'employed' by Cal Dive as 'contract labor' up and until the date he executed the Settlement Release." [Doc. 1, p. 33] However, the Court notes Schmidt signed the Release on December 12, 2013 - the day before he signed the credit application. [Case No. 14-3033, Doc. 77-1, pp. 14, 17; Id. at Doc. 26-2]

"be corrected on the record." [Doc. 21-1, p. 10] On April 22, 2015, Cal Dive filed a motion for leave to file a substitute proposed First Amended Complaint. According to Edwards, Walker and Schmidt, the substitute Complaint corrected only one of the false allegations contained in the First Amended Complaint.[5] [Id. at 11] On May 7, 2015, the trial court denied the Rule 59(e) motion to amend the judgment and denied leave to amend the complaint, finding any amendment would be futile. [Case No. 14-3033, Doc. 99 at 6]

On January 21, 2016, the Fifth Circuit affirmed, finding Cal Dive and Lloyds failed to state a claim of fraudulent inducement, as they "did not sufficiently plead reliance." *Cal Dive* at 218. According to the Fifth Circuit, "The record–and Cal Dive's Complaint itself–contradicts the conclusory assertion that it 'relied upon Schmidt's material fraudulent misrepresentations.'" *Id.* The Fifth Circuit additionally affirmed the district court's denial of Cal Dive and Lloyd's Rule 59(e) motion, finding the filing of the proposed amended complaint would be futile, because like the original complaint, "the proposed amended complaint demonstrates Cal Dive never believed Schmidt's allegations or testimony." *Id.* at 219.

### C.    The Instant Litigation

On October 14, 2015, Schmidt, Walker and Edwards each filed separate lawsuits in federal

---

[5]The First Supplemental and Amended Complaint stated Schmidt had not seen any of his treating physicians post-settlement, the substitute pleading corrected that statement (in light of information subsequently provided to defendants) by noting Schmidt had seen one of his treating physicians on one occasion post-settlement. However, Schmidt, Walker and Edwards contend they had also demanded the following allegations be corrected, which defendants did not correct: (1) allegations that Schmidt "swore under oath" to certain matters when he executed the Release; (2) allegations related to when Schmidt first saw his landlord (i.e., whether that occurred in November or December of 2013); (3) "[a]llegations related to Schmidt's representations on a credit application"; (4) defendants' "claims of 'new evidence' as the basis for their Rule 59(e) motion"; (5) allegations that defendants "had no reason to know about Schmidt's alleged fraud and misrepresentations about his condition"; and (6) "[a]llegations that attorneys, Edwards and Walker, played some part in the alleged fraud." [Doc. 21-1, p. 10]

court against Cal Dive, Lloyds, and their attorneys, the Schonekas Parties, asserting causes of action

for defamation, tortious interference with a maritime contract, bad faith breach of a Jones Act

settlement, wrongful injunction, sanctions, punitive damages, and negligence. [Doc. 1, pp. 55-63]

Each plaintiff filed identical suits in Louisiana State Court the same day.  On October 22, 2015,

plaintiffs dismissed Cal Dive from all suits after receiving notice Cal Dive had filed for bankruptcy.

As a result of the dismissal of Cal Dive, complete diversity existed over the claims of Schmidt and

Walker, and defendants removed those suits on January 8, 2016 to the Western District of Louisiana.

On January 21, 2016, the related suits were reassigned to this Court due to the retirement of Judge

Haik. On January 29, 2016, this Court consolidated the five suits pending before it.[6]

Thereafter, the Schonekas Parties and Lloyds each filed the pending motions to dismiss all

claims pursuant to Rule 12(b)(6). As stated in their opposition briefs, plaintiffs explicitly waive the

following claims: all negligence claims against the Schonekas Parties [Doc. 72, p. 6], negligent

infliction of emotional distress against Lloyds [Id.; Doc. 73, p. 6], malicious prosecution against all

defendants [Doc. 72, p. 20; Doc. 73, p. 7]; abuse of process against all defendants [Id.]; and wrongful

injunction against all defendants. [Doc. 73, p. 8] Plaintiffs clarify in their briefing that their claim

for bad faith breach of a Jones Act settlement is asserted solely against Lloyds. [Doc. 72, p. 22]

Further, in their opposition memoranda, plaintiffs brief their claims of punitive damages and

sanctions solely with regard to Lloyds.  Accordingly, the Court finds to the extent plaintiffs' claims

for punitive damages and sanctions were directed towards the Schonekas Parties, such claims have

been waived. The Court now turns to the pending motions to dismiss.

---

[6]Thus, all suits arising out of the Cal Dive litigation are now before this Court, with the
exception of Edwards' state court suit, which is identical to the suit he filed in this Court. Edwards' state
court suit remains pending at this time. [Doc. 21-1, p. 12]

## II. Standard of Review

Motions to dismiss for failure to state a claim are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable clam. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001). In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." *Id.* at 161–62. When deciding a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007) (internal quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir.2011)(internal quotation marks omitted). The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. However, conclusory allegations and unwarranted deductions are not accepted as true, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint which merely "tenders naked assertions devoid of further factual enhancement" will not survive a motion to dismiss. *Iqbal* at 678 (internal quotation marks and alterations omitted). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and the pleading must contain something more than a statement of facts which merely creates a suspicion

of a legally cognizable right of action. *Twombly* at 555.

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a district court generally "must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000). However, "[t]he court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims." *Brand Coupon Network, L.L.C. v. Catalina Marketing Corp.*, 748 F.3d 631, 635 (5th Cir.2014). Further, "the court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343, n. 6 (5th Cir.1994); *see also Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 570, n. 2 (5th Cir.2005). This includes "the record of the underlying litigation." *Cal Dive* at 216, n. 1 (citing *Norris v. Hearst Trust*, 500 F.3d 454, 461, n. 9 (5th Cir. 2007)).

Finally, a complaint is also subject to dismissal under Rule 12(b)(6) "when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy. . . ." 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE CIVIL § 1357 (3d ed. 2004); *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013)("When a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate"); *see also Costello v. Hardy*, 864 So.2d 129, 148, n. 18 (La. 2004); *City of New Orleans v. Board of Com'rs of Orleans Levee Dist.*, 640 So.2d 237, 253 (La. 1994).

## III.   Analysis

### A.   Defamation

As noted, all plaintiffs assert claims of defamation against all defendants, based upon statements contained in the pleadings filed in the Cal Dive Suit. According to plaintiffs, "The

defamatory statements at issue in this case are the numerous written and publicized allegations by
. . . [defendants] that Schmidt, Edwards, and Walker committed fraud, perjury, fraudulent
misrepresentation, and intentional omission before a tribunal, and conspired to commit same." [Doc.
72, p. 7 (emphasis omitted); *see also* Doc. 73, p. 5] *See e.g. Roebuck v. Dotham Sec., Inc.*, 515
Fed.Appx. 275, 280 (5th Cir. 2013)(to properly state a claim for defamation, the complaint must set
forth "specific allegations regarding the alleged defamatory communications"); *accord Fitzgerald
v. Tucker*, 737 So.2d 706, 713 (La. 1999).

Defamation is a tort involving the invasion of a person's interest in his or her reputation and
good name. *Sassone v. Elder*, 626 So.2d 345, 350 (La. 1993).  To maintain a defamation action
under Louisiana law, a plaintiff must prove the following elements: "(1) a false and defamatory
statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence
or greater) on the part of the publisher; and (4) resulting injury." *Kennedy v. Sheriff of E. Baton
Rouge*, 935 So.2d 669, 674 (La. 2006); *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d
164, 181 (5th Cir. 2009). If any of the elements of the tort is lacking, the cause of action fails.
*Costello*, 864 So.2d at 139.  "The fault requirement is generally referred to in the jurisprudence as
malice, actual or implied." *Kennedy* at 674.

> By definition, a statement is defamatory if it tends to harm the reputation of
> another so as to lower the person in the estimation of the community, deter others
> from associating or dealing with the person, or otherwise expose the person to
> contempt or ridicule. In Louisiana, defamatory words have traditionally been divided
> into two categories: those that are defamatory per se and those that are susceptible of
> a defamatory meaning. Words which expressly or implicitly accuse another of
> criminal conduct, or which by their very nature tend to injure one's personal or
> professional reputation, without considering extrinsic facts or circumstances, are
> considered defamatory per se. When a plaintiff proves publication of words that are
> defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by
> the defendant. Injury may also be presumed. When the words at issue are not

defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault) and injury.

*Kennedy* at 674-75 (internal citations omitted).

### 1.     Defamation claims asserted by Walker and Edwards

Both Lloyds and the Schonekas Parties contend the defamation claims asserted by Walker and Edwards should be dismissed, because defendants made no defamatory statements concerning Walker or Edwards. Defendants note they never stated Walker or Edwards committed or were complicit in any of Schmidt's fraudulent acts. [Doc. 68-1, p. 9; Doc. 66-1, p. 21] In response, plaintiffs contend their pleadings sufficiently set forth defamatory statements made by defendants about Walker and Edwards in the First Supplemental and Amended Complaint filed in the Cal Dive litigation. [Doc. 72, pp. 12-13; Doc. 73, pp. 3-4] More specifically, plaintiffs identify "¶¶ 30, 31, 33, 49, and 50 of the Amended Complaint in the *Cal Dive Suit*" as the statements which defamed Edwards and Walker. [Doc. 64, p. 23] The referenced paragraphs in the Cal Dive Suit are set forth in a section of the pleading entitled, "Factual Background," and read as follows[7]:

### 30.

Schmidt and his attorneys represented to plaintiffs at the settlement conference that due to Schmidt's alleged permanent and total disability, he required all of the accommodations contained in the October 8, 2013, Life Care Plan.

---

[7]The Court notes the First Supplemental and Amended Complaint in the Cal Dive Suit remains under seal. However, the particular paragraphs cited by the Court are also cited verbatim in plaintiffs' petition herein (which is not under seal), effectively waiving the seal as to the above paragraphs. Because the Court in ruling on a motion to dismiss may refer to "the record of the underlying litigation," and because the First Supplemental and Amended Complaint is the best evidence of its contents, the Court cites to and quotes from that pleading. *Cal Dive*, 639 Fed.Appx. at 215, n. 1. Additionally, as addressed at note 3, *supra*, the amended complaint was sealed because it referred "to portions of the Release, including terms of settlement," which were subject to a confidentiality clause. [Case No. 14-3033, Doc. 77, p.1] The Court makes no references to the terms of the settlement in this Ruling.

**31.**

Schmidt and his attorneys also represented to plaintiffs at the settlement conference that due to Schmidt's alleged permanent and total disability, he was entitled to millions of dollars in damages for loss of future earning capacity in accordance with the March 21, 2013, Economic Loss Report.

**32.**

During the settlement conference, Schmidt and his attorneys represented, through their statements, actions and/or silence, that Schmidt's condition had not changed or improved in any material respect and that his condition was the same as it was represented to be at the time of Schmidt's depositions in January 2013, and in accordance with the Life Care Plan and Economic Loss Report.

**33.**

At no time during the settlement conference did Schmidt or his attorneys advise plaintiffs or plaintiffs' attorneys that Schmidt's condition had changed or improved in any way, and plaintiffs had no reason to know or suspect that Schmidt's condition had changed or improved.

. . . .

**49.**

Neither Schmidt nor his attorneys disclosed any of this highly material and relevant information to plaintiffs at the October 15, 2013, settlement conference.[8] They failed to disclose to plaintiffs that Schmidt did not require use of a wheelchair and could sit up and walk without assistance or difficulty; that Schmidt would not require any housing modifications or future medical care; that Schmidt could care for himself and drive a car and had obtained employment.

---

[8]The "highly material and relevant information" referenced in paragraph 49, *supra*, includes, but is not limited to, the following allegations: after reaching a settlement but before executing the written Release, Schmidt obtained a Texas driver's license with no restrictions other than for eyeglasses; Schmidt did not disclose to the Texas Department of Public Safety that he was in any way disabled or suffered from any condition which would preclude him from being able to safely operate a motor vehicle; within days of executing the Release, Schmidt leased a house that had none of the handicap accommodations listed as requirements in Schmidt's Life Care Plan; Schmidt never requested permission from his landlord to make any modifications to the property; Schmidt's landlord has never seen Schmidt use a wheelchair. [Case No. 14-3033, Doc. 77-1, ¶¶ 37-43]

**50.**

> In fact, Schmidt and his attorneys represented just the opposite at the October 15, 2013, settlement conference: that Schmidt was totally and permanently disabled and incapable of sitting or standing up for more than a minute or two at a time, much less walking, driving, or obtaining employment.

[Case No. 14-3033, Doc. 84, pp. 3, 9-13] According to Walker and Edwards, "Through the above referenced allegations, [defendants] openly alleged that not only Schmidt, but his attorneys, Edwards and Walker, engaged in knowing and wilful misrepresentations of material fact to a federal magistrate and opposing parties and counsel during the October 15, 2013 mediation." [Doc. 64, ¶ 291]

The Court has reviewed all pleadings filed in the Cal Dive Suit and finds there are no allegations that Edwards and Walker had knowledge of any misrepresentations by Schmidt. Indeed, the proposed amended complaint specifically states Cal Dive and Lloyds "do not believe that Edwards and Walker were aware of Schmidt's fraud." [Case No. 14-3033, Doc. 84, ¶ 107] Rather, the cited portions of the Cal Dive complaint simply indicate Edwards and Walker were presenting their client's case in an adversarial setting, and in conformity with the facts and evidence known to Edwards and Walker at that time.

Further, the Court notes the statements relied upon by Edwards and Walker constitute the factual basis of the sole claim asserted by Cal Dive and Lloyds against Walker and Edwards in the Cal Dive litigation - a claim of unjust enrichment. [Id. at p. 25] As is common in asserting such a claim, Cal Dive and Lloyds point to no intentional wrongdoing by Walker or Edwards, but rather, premise their claim upon the legal principle that the avoidance or reversal of a judgment on the grounds of fraud gives rise to a claim of unjust enrichment against a party who received payment

pursuant to such a judgment. [Id. at ¶¶ 100-101; *see also* ¶ 102 ("attorneys who are paid under contingency fee contracts may be held liable in restitution where a settlement is set aside for fraud *even absent any knowledge of their client's wrongdoing*"), ¶ 108("[p]laintiffs have no other adequate remedy at law against Edwards and Walker")]  All allegations of fraudulent conduct are based upon the conduct of Schmidt alone. [Id. at ¶ 70 ("But for Schmidt's fraudulent misrepresentations . . ., plaintiffs never would have entered or funded the settlement. . ."); *accord* at ¶¶ 76-81, 88-90, 95-97, 106] The claims of fraudulent inducement and fraud were asserted against Schmidt alone and were based upon Schmidt's actions, and not the actions of his attorneys. [Id. at pp. 18-25, 27-28] Because Edwards and Walker have failed to identify any defamatory statements directed towards them in the Cal Dive Suit, the Court finds Edwards and Walker have failed to state a claim of defamation against Lloyds and the Schonekas Parties.

### 2.  Defamation claims against the Schonekas Parties arising out of statements made in a judicial proceeding[9]

Again, plaintiffs contend the Schonekas Parties defamed them through "the numerous written and publicized allegations by . . . [defendants] that Schmidt, Edwards, and Walker committed fraud, perjury, fraudulent misrepresentation, and intentional omission before a tribunal, and conspired to commit same." [Doc. 72, p. 7; *see also* Doc. 73, p. 5 (emphasis omitted)] To state a claim of defamation against the Schonekas Parties, the complaint must set forth intentionally tortious conduct, as mere negligence is insufficient to state a claim of defamation against an opponent's attorney.

---

[9]While the Court has already found the complaint fails to state a claim of defamation against Edwards and Walker, the Court includes the claims of Edwards and Walker in this portion of its Ruling as well, as the Court's reasoning in this portion of the Ruling is equally applicable to Edwards and Walker. Accordingly, the reasoning in this section will serve as an alternative basis for the dismissal of the claims of defamation asserted by Edwards and Walker.

"Louisiana subscribes to the traditional, majority view that an attorney does not owe a legal duty to his client's adversary when acting in his client's behalf." *Montalvo v. Sondes*, 637 So.2d 127, 130 (La. 1994). Accordingly, as a general rule, actions against an opponent's attorney lying in negligence are prohibited.[10] *Id.* However, the foregoing rule does not prevent an attorney from being sued by his client's opponent for intentionally tortious conduct. *Id.* As discussed in *Montalvo*:

> Of course, identifying an intentional tort in the context of an attorney's actions may be more difficult than identifying a traditional intentional tort. It is clear that the mere filing of a lawsuit, even if the suit appears meritless on its face, is not enough, since the attorney may be simply the instrument through which the client invokes judicial determination. **Rather, we believe it is essential for the petition to allege facts showing <u>specific malice</u> or an <u>intent to harm</u> on the part of the attorney in persuading his client to initiate and continue the suit.**

*Id.* (citations omitted; emphasis added).

Thus, to state a cause of action in a suit against an opponent's attorney, mere allegations of negligence will not suffice; rather, the facts set forth in the complaint must establish the attorney "intended to cause direct harm" to the plaintiff. *Id.* As one court has explained, "A litigant who wishes to sue his adversary's attorney must show that the attorney acted with a specific malice or intent to personally inflict direct harm upon his client's adversary and with full knowledge that his conduct would cause such harm." *In re Succession of Carroll*, 72 So.3d 384, 389 (La.App. 2 Cir. 2011). As stated by another, "The Louisiana Supreme Court has thus aligned itself with the view that in order to prevail on a claim of intentional tort against an adversary's attorney, the plaintiff-

---

[10]"The intent of this rule is not to reduce an attorney's responsibility for his or her work, but rather to prevent a chilling effect on the adversarial practice of law and to prevent a division of loyalty owed to a client." *Montalvo* at 130. As stated in *Penalber v. Blount*: "An attorney's duty is to zealously represent his client. To accomplish this obligation, adversarial counsel must not be hampered by fear of personal liability for negligently injuring his client's opponent. The attorney's paramount duty is to his client." *Id.*, 550 So.2d 577, 581 (La.1989).

nonclient must . . . demonstrate that the defendant-attorney had a desire to harm which is independent of the desire to protect [his] client." *Congress Square Ltd. Partnership v. Polk*, 2011 WL 837144, *11 (E.D.La.)(internal quotation marks omitted). Accordingly, in order to adequately state a claim against the Schonekas Parties for defamation, the complaint must contain sufficient factual matter such that the Court can draw the reasonable inference that the Schonekas Parties (independent of their clients) intended to cause direct harm to Schmidt, Edwards and Walker by filing the fraudulent inducement complaint on Cal Dive and Lloyds' behalf. *Montalvo* at 130. In the defamation context, this means plaintiffs "must plead facts that show that the alleged defamatory statements [in the Cal Dive pleadings] were made with malice or intent to harm." *Brown v. Wimberly*, 477 Fed.Appx. 214, 216 (5th Cir. 2012).

The Schonekas Parties contend plaintiffs' complaint fails to state a claim against them, as it does not allege facts showing the Schonekas Parties acted with specific malice or intent to harm. [Doc. 66-1, p. 14] According to the Schonekas Parties, "the purportedly defamatory statements in the . . . Complaint have no indicia of being made with malice and intent," other than plaintiffs' conclusory allegations of malice and intent to harm. [Id. at 8, 16] The Schonekas Parties note plaintiffs' complaint "is devoid of allegations the Schonekas Parties acted independent of their representation of Cal Dive and Underwriters in the Cal Dive suit." [Id. at 16] Finally, the Schonekas parties contend they had a reasonable belief in the truth of the allegations set forth in the Cal Dive pleadings, and therefore, plaintiffs have not shown specific malice or intent to harm. [Id. at pp. 14, 16, 17]

The specific allegations of the pleadings plaintiffs identify as supporting the element of specific malice or intent to harm [*see* Doc. 72, pp. 10-14] are the following:

- Prior to filing the Cal Dive Suit, Cal Dive and Lloyds "had actual knowledge of the voluminous medical records, opinions, and testimony from 23 depositions generated during the *Schmidt Suit* proving Schmidt was injured as a result of the accident and totally and permanently disabled as a result thereof." [Doc. 64, ¶ 248; *see also* Doc. 72, p. 11] As Cal Dive and Lloyds' attorneys, the foregoing "information and actual knowledge was imputed to [the Schonekas Parties]." [Doc. 64, ¶ 248] Therefore, the Schonekas Parties' filing of a suit accusing plaintiffs of fraud, when the Schonekas Parties knew that allegation was false, is sufficient to show the Schonekas Parties harbored specific malice or intent to harm plaintiffs. [Doc. 72, p. 16]

- In the Cal Dive Suit, defendants alleged "they had no reason whatsoever to know or suspect any fraud" on the part of plaintiffs. [Doc. 72, pp. 11-12] However, "the record is glaringly clear that when Defendants stated they had no reason to suspect any fraud, they knew this allegation to be false." [Id.] Plaintiffs contend defendants cannot credibly argue that they were unaware of any fraud when they filed the Cal Dive Suit in light of the following information: (1) in the Schmidt litigation, Cal Dive filed a counterclaim against Schmidt for fraud[11]; (2) the settlement language in the Schmidt suit contained language "indicating settlement was of a 'questionable' claim"; (3) an expert witness in the Schmidt litigation opined in his deposition that Schmidt "was engaged in 'factitious' behavior, and . . . was potentially malingering. . . ."[12] [Id.; *see also* Doc. 64, ¶¶ 237-38, 258, 278]

- In the amended complaint in the Cal Dive Suit, defendants alleged they had subpoenaed medical records from Schmidt's prior treating physicians for any treatment provided post-settlement, but all responded they had no record of any treatments during that period of time. [Doc. 72, p. 12; *see also* Doc. 64,  ¶ 294; Case No. 14-3033, Doc. 95, p. 2] However, five days after submitting the proposed amended complaint, defendants received detailed notes from Dr. Paul Harch, documenting "his attempts on October 21, 2013 [i.e., six days after the mediation] to have Schmidt fitted with a G-suit . . . in accordance with the Life Care Plan."

---

[11]The Court notes the counterclaim filed in the Schmidt litigation sought reimbursement of maintenance and cure on the grounds that Schmidt had purposefully concealed his extensive history of treatment for mental illness from Cal Dive prior to and during his employment. [Case No. 12-930, Doc. 18] The counterclaim makes no allegations of fraud in connection with the injuries arising from Schmidt's April 7, 2010 diving accident.

[12]The Court finds this particular argument to be rather circular and unhelpful to plaintiffs' argument. Essentially, plaintiffs contend during the course of the Schmidt litigation, Cal Dive and Lloyds developed the opinion Schmidt was faking his injuries, and therefore, when defendants filed the Cal Dive suit, their statement that they had no reason to suspect fraud on Schmidt's part prior to the filing of their suit was false. As defamation involves a "false and defamatory statement involving another," it would appear plaintiffs are asserting defendants made a defamatory statement about themselves, which is a legal impossibility. *Kennedy* at 674. Furthermore, the Court notes merely having a suspicion of fraud is not sufficient to file a suit for fraud, as Rule 11 requires the filer to certify "the factual contention have evidentiary support," and Rule 9 requires fraud to be pleaded "with particularity."

Page 16 of 30

[Doc. 64, ¶¶ 297-98] Additionally, in early April 2015, defendants received a video of Schmidt's visit with Dr. Harch on October 21, 2013, which "depicts [Schmidt] arriving for his visit, after mediation, in his reclining wheel chair, suffering through spikes/drops of his heart rate and blood pressure as he goes from sitting to standing to lying down to wearing the g-suit." [Id. at ¶¶ 301-02] However, defendants waited until April 22, 2015 to correct their statement that Schmidt had not seen any treating physicians post-settlement. [Id. at ¶ 305] According to plaintiffs, "while defendants may not have known these allegations were false at the time they were made, they failed to take immediate or timely action to correct the record when presented with proof that the allegations were false." [Id. at ¶ 295] According to plaintiffs, not only did this evidence show plaintiff sought treatment after the mediation, but also proved that Schmidt "was never faking his injury from the outset." [Doc. 72, p. 12] According to plaintiffs, "Defendants' intentional downplaying and ignorance of evidence in these regards, then continuing with the prosecution of the case even through appeal to the Fifth Circuit clearly fits the definition of malice."[13] [Doc. 72, p. 12]

- In the Cal Dive Suit, Cal Dive and Lloyds sought to enjoin the administrators of the structured settlement from making any further payments to Schmidt, Edwards or Walker despite their knowledge that preventing plaintiffs from access to their annuity income would cause direct and immediate harm. [Id. at pp. 13-14; Doc. 64, ¶¶ 242, 244] Likewise, the Schonekas Parties knew preventing plaintiffs from accessing their annuity income would cause them direct and immediate financial harm, but nonetheless encouraged their clients to seek to enjoin the administrators from making further payments. [Doc. 64, ¶¶ 250, 253]

The Court finds the facts pleaded do not show "specific malice or an intent to harm" on the part of the Schonekas Parties, independent of a desire to protect their clients. *Montalvo* at 130; *Congress Square* at *11. Rather, the allegations show the Schonekas Parties were simply the instrument through which Cal Dive and Lloyds invoked judicial determination for their claim of fraudulent inducement. *Montalvo* at 130. Nothing in the pleadings before this Court shows the Schonekas Parties acted outside of their role as Cal Dive and Lloyds' attorneys in the Cal Dive Suit. Nothing in the pleadings before this Court shows the Schonekas Parties harbored any malice against

---

[13]Plaintiffs argue defendants' correction to their pleadings "downplayed" the evidence from Dr. Harch, because while it noted Schmidt did see one of his treating physicians on one occasion post-settlement, it did not state at that visit, "Plaintiff was in his reclining wheelchair, reclined, and debilitated from dysautonomia," and that "he was being fitted for a G-suit." [Doc. 72, p. 12; Doc. 64, ¶¶ 310-11]

Schmidt, Edwards or Walker, or acted with an intent to harm them. As plaintiffs admit in their pleadings, there was evidence supporting the position of both plaintiffs and defendants in the underlying litigation. [*See e.g.* Doc. 72, p. 11 (citing to Doc. 64, ¶¶ 258, 278)] Litigation is inherently adversarial, and "an attorney's duty is to zealously represent his client." *Penalber v. Blount*, 550 So.2d 577, 581 (La. 1989). Because the pleadings in this matter fail to allege facts showing specific malice or an intent to harm on the part of the Schonekas Parties in persuading their clients to initiate and continue the Cal Dive suit, the Court finds plaintiffs have failed to state a claim of defamation against the Schonekas Parties for statements made in the Cal Dive litigation.[14] *Montalvo* at 130.

### 3.    Qualified Privilege

All defendants contend the statements alleged to be defamatory are protected by a qualified privilege.[15] "In Louisiana, privilege is a defense to a defamation action." *Kennedy*, 935 So.2d at 681. "The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order

---

[14]A similar outcome was reached in *In re Succession of Carroll*, 72 So.3d 384 (La.App. 2 Cir. 2011). There, the children of a decedent brought an action against the attorney who prepared the decedent's will, accusing the attorney of conspiring with the legatees and participating in a scheme to defraud the plaintiffs of their rightful inheritance. In affirming the trial court's grant of an exception of no cause of action, the Louisiana appellate court observed that plaintiffs made "no specific allegations that [the attorney] acted with malice or in bad faith with the intent to cause direct harm to plaintiffs." *Id.* at 389; *see also Montalvo*, 637 So.2d 127 (Pleading failed to state cause of action in intentional tort, as allegations that the underlying suit was "frivolous" and instigated in "bad faith" were "mere conclusions unsupported by facts"; rather, reduced to its essentials, the complaint simply alleged opponent's attorneys failed to apprise themselves of certain relevant information prior to filing suit, and made certain allegations in their pleadings that were no longer accurate.)

[15]The Court has already found the complaint fails to state a claim of defamation on behalf of Edwards and Walker, and has additionally found the complaint fails to state a claim of defamation against the Schonekas Parties. Accordingly, the only claim of defamation remaining before this Court is Schmidt's claim of defamation against Lloyds. However, as the Court's reasoning in this portion of the Ruling is equally applicable to all claims of defamation asserted in this matter against all defendants, it therefore includes all claims of defamation in this section of its Ruling. Thus, the reasoning in this section will serve as an alternative basis for the dismissal of those claims of defamation previously dismissed in sections II(A)(1) and (2).

to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability." *Id.* Statements made in judicial proceedings are subject to a conditional (or qualified) privilege.[16] *Costello*, 864 So.2d at 142, n. 13; *Freeman v. Cooper*, 414 So.2d 355, 359 (La. 1982); *Western American Transp., LLC v. Morrow*, 2008 WL 182208, *2 (5th Cir.). In order for the conditional privilege to apply, "the statement must be material and must be made with probable cause and without malice." *Freeman* at 359. When defamatory statements are subject to a conditional privilege, the plaintiff must prove the privilege is inapplicable. *Kennedy* at 683; *Flanner v. Chase Inv. Services Corp.*, 600 Fed.Appx. 914, 924 (5th Cir. 2015); *Hakim v. O'Donnell*, 144 So.3d 1179, 1190 (La.App. 2 Cir. 2014). Finally, "When a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." *Miller*, 726 F.3d at 726; *see also City of New Orleans v. Board of Com'rs of Orleans Levee Dist.*, 640 So.2d 237, 253 (La. 1994); *Costello*, 864 So.2d at 148, n. 18.

Determining whether a conditional or qualified privilege exists involves a two step process. *Kennedy* at 682. "First, it must be determined whether the attending circumstances of a communication occasion a qualified privilege." *Id.* Second, a court must determine "whether the privilege was abused, which requires that the grounds for abuse - malice or lack of good faith - be examined." *Id.* A privilege is abused if the publisher (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity. *Id.* Mere negligence as to falsity (*i.e.*, a lack of reasonable grounds for believing the statement to be true), or even a failure to investigate, is <u>not</u> sufficient to prove abuse of the conditional privilege; instead, knowledge or reckless disregard as to falsity is

---

[16]An absolute (or unconditional) privilege exists in a limited number of situations, "such as statements by judges and legislators in judicial and legislative proceedings." *Kennedy* at 681.

required. *Id.* at 683, 689; *Romero v. Thomson Newspapers (Wisconsin), Inc.*, 648 So.2d 866, 869

(La. 1995).

> While "reckless disregard" cannot be fully encompassed in one definition, the
> courts have provided some guidance on application of the standard. For example, in
> *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964), the Supreme Court explained that
> only those false statements made with a high degree of awareness of their probable
> falsity meet the reckless disregard standard. In *Curtis Publishing Co. v. Butts*, 388
> U.S. 130 (1967), the Supreme Court reiterated that reckless disregard requires a
> plaintiff to "prove that the publication was deliberately falsified, or published despite
> the publisher's awareness of probable falsity." Finally, in *St. Amant v. Thompson*,
> . . . the Supreme Court explained that "[t]here must be sufficient evidence to permit
> the conclusion that the defendant in fact entertained serious doubts as to the truth of
> his publication." Under this standard, even proof of gross negligence in the
> publication of a false statement is insufficient to prove reckless disregard. Rather,
> there must be evidence that the defendant was highly aware that the statements were
> probably false.
>
> . . . .
>
> . . . Further, as we explained in *Trentecosta*, conduct which would constitute
> reckless disregard is typically found where a story is fabricated by the defendant, is
> the product of his imagination, or is so inherently improbable that only a reckless
> man would have put it in circulation.

*Id.* at 688-89 (internal citations omitted). It is plaintiffs' burden to "come forward with specific

evidence of malice and bad faith, as opposed to broad, unsubstantiated allegations."[17] *Smith v. Our*

*Lady of the Lake Hosp., Inc.*, 639 So.2d 730, 747 (La. 1994); *Kennedy* at 683.

In this matter, no argument is made that the statements alleged to be defamatory do not give

rise to the conditional privilege. Accordingly, the Court turns to the second step - *i.e.*, whether the

privilege was abused. With regard to materiality, plaintiffs concede the statements at issue may have

been material as to the allegations against Schmidt, but appear to question whether the statements

---

[17]As observed in *Smith*, the purpose of qualified immunity is to protect certain persons from
litigation in certain circumstances; the purpose of qualified immunity would be defeated if a plaintiff
were only required to speculate as to malice in order to state a valid claim. *Smith*, 639 So.2d at 747.

were material as to Walker and Edwards.[18] [Doc. 72, p. 19]  Plaintiffs further assert the statements

were made without probable cause and with malice, arguing: "As noted above, Plaintiffs have plainly

alleged specific malice on the part of the [defendants] because they made allegations of criminal

conduct as to all Plaintiffs which they knew to be false and in some instances discovered to be false

with tangible evidence, yet let the allegations stand.  The [defendants'] actions and inactions after

being put on notice of the falsity of their allegations further removes the element of probable cause."

[Id. at 19]

The Court finds the qualified privilege applies to this matter.  The statements were material,

because whether Schmidt committed fraud and/or perjury by failing to disclose his condition (or

improved condition) was the central issue in dispute in the Cal Dive Suit.[19]  The statements were

---

[18]Plaintiffs' entire discussion of "materiality" is as follows:

Lastly, the Schonekas parties argue that the statements were material to the
litigation. While this may be true as to the allegations pertaining to Schmidt, it begs the
question of whether same is true with regards to the allegations against attorneys Walker
and Edwards. In one vein, the Schonekas Defendants argue that they never even made
allegations of fraudulent conduct on the part of Walker and Edwards and in the other,
they argue that such allegations were material to the litigation. The Schonekas
Defendants cannot have it both ways. Either defamatory allegations were made, and they
were pertinent to the litigation, or they were not made at all, in which case why have any
allegations attributing liability to the lawyers in the first place? Regardless of what the
Schonekas Defendants state at this time though, the record is clear- they specifically and
expressly accuse the attorneys of having knowledge that Schmidt was not as injured as
he said, and specifically represented otherwise to the court and counsel during a
settlement conference.

[Doc. 72, pp. 19-20 (citations omitted)]

[19]*See e.g. Kirksey v. New Orleans Jazz & Heritage Foundation, Inc.*, 116 So.3d 664, 670-71
(La.App. 4 Cir. 2013) (In a suit for defamation based upon previous litigation accusing plaintiff of
misappropriating funds, the appellate court sustained the trial court's grant of an exception of no cause of
action; the appellate court held the alleged defamatory statements were based upon words such as
"misappropriation, conversion, and civil conspiracy, all of which words are used commonly in the area of
civil tort litigation," and such statements were protected by the conditional privilege where the
statements were necessary to sustain a cause of action for misappropriation and conversion).

made with probable cause, because defendants were in possession of surveillance reports and other

evidence indicating that Schmidt was performing a number of activities which, based upon his own

prior testimony and that of his treating physicians, he should not have been able to do.[20] Further, as

noted by defendants, "The surveillance suggested that the rate Schmidt allegedly improved following

settlement was impossible based upon the medical reports of his physicians or, at a minimum, it was

highly suspect."[21] [Doc. 68-1, pp. 11-12] Thus, plaintiffs have not pleaded facts showing the

statements were made with malice, because defendants had a reasonable basis to believe their

allegations were truthful. Accordingly, the Court finds plaintiffs have failed to plead sufficient facts

to overcome the qualified privilege.[22]

---

[20]*See e.g. Miskell v. Ciervo*, 557 So.2d 274 (La.App. 4 Cir. 1990) (affirming the grant of an exception of no cause of action by an insured who filed a defamation suit against his insurer and his insurer's attorneys; the claim was barred by the qualified privilege, as the defendants' pleadings in the underlying proceeding established that they believed plaintiff attempted to defraud his insurance company, the claim of fraud was based upon information learned that a fire to plaintiff's automobile may have occurred prior to plaintiff's payment to reinstate his insurance coverage, and there was no evidence of malice).

[21]*See e.g. Newcomer v. Bennett*, 27 So.3d 858, 861-62 (La.App. 5 Cir. 2009) (affirming the grant of an exception of no cause of action where the alleged defamatory statements accusing plaintiff of adultery were pertinent to the issue of fault in the underlying divorce litigation, were made with the belief that such a relationship took place, and other than conclusory allegations, there was no evidence of malice towards plaintiff); *Jacobs v. O'Bannon*, 472 So.2d 180, 181-82 (qualified privilege applied to statements in an appellate brief, which suggested the child at issue in a paternity suit may have been the product of incest between the opposing party and her father); *Western American Transp., LLC v. Morrow*, 2008 WL 182208, (5th Cir.) (affirming the district court's dismissal of a defamation claim on the basis of the qualified privilege, finding as follows: the allegations of theft and conversion were central to the breach of contract claim and were therefore material, and the allegations of theft and conversion were made with probable cause and without malice, as "a party which believes that its obligee has been 'diverting all or part of accounts receivable' – were those fact proved to be true – arguably would be justified in asserting that its obligee was guilty of theft and conversion.")

[22]As discussed by the Louisiana Fourth Circuit Court of Appeals, there is a policy consideration which militates against defamation actions in factual circumstances such as those before this Court:

> To allow defamation suits to arise out of statements like these would foster an
> interminable flood of litigation. Whenever one took umbrage to such statements he or

## B.    Intentional Infliction of Emotional Distress

All defendants move for dismissal of plaintiffs' claims of intentional infliction of emotional

distress. To recover for intentional infliction of emotional distress:

> [A] plaintiff must establish (1) that the conduct of the defendant was extreme and
> outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and
> (3) that the defendant desired to inflict severe emotional distress or knew that severe
> emotional distress would be certain or substantially certain to result from his conduct.
>
> The conduct must be so outrageous in character, and so extreme in degree, as
> to go beyond all possible bounds of decency, and to be regarded as atrocious and
> utterly intolerable in a civilized community.
>
> ....
>
> On the other hand, conduct which may otherwise be extreme and outrageous,
> may be privileged under the circumstances. Liability does not attach where the actor
> has done no more than to insist upon his legal rights in a permissible way, even
> though he is aware that such insistence is certain to cause emotional stress. . . .
>
> The distress suffered must be such that no reasonable person could be
> expected to endure it. Liability arises only where the mental suffering or anguish is
> extreme.
>
> ....
>
> Liability can arise only where the actor desires to inflict severe emotional
> distress or where he knows that such distress is certain or substantially certain to
> result from his conduct. The conduct must be intended or calculated to cause severe
> emotional distress and not just some lesser degree of fright, humiliation,

---

she might file suit. Even worse, after the initial defamation suit is concluded, more
defamation suits would follow to obtain satisfaction for offensive statements made in the
first defamation suit. The present case is a classic case of bitter litigation being
conducted by aggressive, zealous counsel. Unless a qualified privilege protects them and
their clients against prosecution for words uttered and statements made in the heat of
litigious battle lawsuits among them might never end.

*Jacobs*, 472 So.2d at 182; *see also Costello*, 864 So.2d at 142, n. 13 (citing with approval policy
considerations set forth in *Jacobs*, and noting, "Litigants must be free to allege facts constituting
inappropriate conduct if there is any reasonable basis for such allegations and the misconduct is relevant
to the proceeding.")

embarrassment, worry, or the like.

*White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La.1991)(internal citations omitted). "[C]ourts require truly outrageous conduct before allowing a claim for intentional infliction of emotional distress even to be presented to a jury." *Nicholas v. Allstate Ins. Co.*, 765 So.2d 1017, 1024-25 (La.2000). Conduct which is merely tortious or illegal does not rise to the level of being extreme and outrageous for purposes of the tort of intentional infliction of emotional distress. *Id.*

Plaintiffs assert they have sufficiently set forth a claim for intentional infliction of emotional distress, arguing as follows:

> Here, [defendants] alleged that the Plaintiffs committed the crimes of fraud, perjury, suborning perjury, fraudulent misrepresentation, intentional omission and conspiracy to commit same. These allegations are clearly outrageous, considering the impacts such allegations can have on member of the bar and upon a permanently disabled man whose sole source of income is annuity payments from a personal injury lawsuit. In keeping with the potential harms, Plaintiffs allege that [defendants] disseminated copies of the original complaint to various recipients, including but not limited to various members of the bar association and other interested parties with the intent of causing harm in their reputation amongst the bar and the public at large, harm in their business good will, particularly in the diving community, and to otherwise humiliate them. Plaintiffs also allege that the [defendants] knew that preventing the Plaintiffs from access to their respective annuity income from the settlement would cause them direct and immediate financial harm and nonetheless sought to enjoin any further annuity payments to the Plaintiffs in an open and obvious attempt to cause them harm. All Plaintiffs have alleged that they rightly suffered severe emotional distress by way of embarrassment in the community (and particularly the legal community for the lawyers); aggravation of Schmidt's prior medical condition; and severe financial impact.

[Doc. 72, p. 21]

The Court finds no behavior has been alleged in this matter which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *White* at 1209. The Court further finds nothing alleged in the pleadings in this matter would be "regarded as

atrocious and utterly intolerable in a civilized community." *White* at 1209. While the allegations in this matter show vigorously contested litigation, that does not rise to the level of being "extreme and outrageous." Again, even conduct which is tortious or illegal does not rise, in and of itself, to the level of being extreme and outrageous. *Nicholas* at 1025. Accordingly, the Court finds plaintiffs have failed to state a claim of intentional infliction of emotional distress.

## C.    Tortious Interference with Contractual Relations

All defendants seek dismissal of plaintiffs' claims for tortious interference with contractual relations. According to plaintiffs, defendants' request in the Cal Dive Suit for an injunction against the administrators of the structured settlement prohibiting them from disbursing further payments constituted "tortious interference with contractual relations," because it was "an attempt to induce and/or cause [the administrators] to breach the contract or render its performance impossible or more burdensome."[23] [Doc. 1, ¶ 205]

In *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La. 1989), "the Louisiana Supreme Court recognized a very narrow cause of action for tortious interference with contracts." *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991). "The *9 to 5 Fashions* Court specifically recognized only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person and disavowed any intention to adopt whole and undigested the fully expanded common law doctrine of interference with contract." *Huffmaster v. Exxon Co.*, 170 F.3d 499, 504 (5th Cir. 1999). As set forth in *9 to 5*, the elements of the cause of action for intentional interference with contracts are:

---

[23]The request for injunction was never taken up, and no injunction ever issued in the Cal Dive Suit.

(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Id.* at 234.

Plaintiffs recognize the narrow confines of such a cause of action, but argue this Court should expand the cause of action. In support, plaintiffs cite to *Sanborn v. Oceanic Contractors, Inc.*, 448 So.2d 91, 95, n.5 (La. 1984), arguing in that case, the Louisiana Supreme Court "indicated . . ., in dicta, that under the right circumstances, recovery may be permitted for intentional interference with contracts." [Doc. 72, p. 24]

First, the Court notes the case upon which plaintiffs rely issued five years before the Louisiana Supreme Court issued its decision in *9 to 5*, narrowly recognizing a cause of action for tortious contractual interference for the first time. Second, in the *Sanborn* case, the Louisiana Supreme Court noted Louisiana had not (at that time) recognized a cause of action for tortious interference with contracts, and the case before it did "not present the issue." *Id.* at 95, n.5. Nevertheless, the court opined, "were plaintiff to allege and prove defendant intentionally and willfully interfered with plaintiff's contract with [a third party], that such intentional interference was the proximate cause of the failure of the contract, and that defendant's actions were motivated by malice, or at least not by a significant interest of its own, he might well be entitled to relief." *Id.* In this matter, the Court has already found plaintiffs have failed to set forth facts constituting malice on the part of defendants. Additionally, plaintiffs have not pleaded facts showing there was a "failure of the contract." Finally, the United States Court of Appeal for the Fifth Circuit has interpreted *9 to*

5 as requiring that the defendant owe a "narrow, individualized duty" to the plaintiff in order for the

plaintiff to have a viable claim for tortious interference with a contract. *Petrohawk Properties, L.P.*

*v. Chesapeake Louisiana, L.P.*, 689 F.3d 380, 396 (5th Cir. 2012). In this matter, plaintiffs have

identified no duty owed to them by defendants. Accordingly, the Court finds plaintiffs have failed

to state a claim for intentional interference with contractual relations.

**D.      Breach of Jones Act Settlement[24]**

Lloyds seeks dismissal of plaintiffs' claim of breach of the Jones Act settlement. Pursuant

to its motion to dismiss, Lloyds argues this claim must fail, as plaintiffs "have not alleged any

specific breach." [Doc. 68-1, p. 25]

In their complaint, plaintiffs state the actions of Lloyds in filing the Cal Dive Suit "were

intended not only to breach the settlement agreement, but were intended to rescind the contract."

[Doc. 1, ¶ 211] According to plaintiffs, Lloyds suit to rescind the contract of settlement makes

Lloyds a "bad faith obligor," entitling plaintiffs to damages. [Id. at ¶¶ 212-13] In their opposition to

the motion to dismiss, plaintiffs argue as follows:

> Here, Plaintiffs have alleged that LLOYDS vigorously attempted to rescind
> the settlement contract in bad faith, which is a defective and delayed performance.
> Moreover, Plaintiffs did suffer actual damages from Lloyd's breach, namely, they
> were forced to defend against an unwarranted injunction seeking to cut off the
> settlement's funding. Under these circumstances, Plaintiffs have adequately alleged
> a breach of the Jones Act Settlement at issue in this case.

[Doc. 73, p. 7]

---

[24]All parties have briefed this claim pursuant to Louisiana law, and the Court will accept the
application of Louisiana law to plaintiffs' claim of breach of the settlement agreement for purposes of
this Ruling.

In order to state a valid claim for breach of contract under Louisiana law, a plaintiff must allege: (1) an undertaking of an obligation to perform, (2) a failure to perform the obligation[25], and (3) damages resulting from the failure to perform. *Sanga v. Perdomo*, 167 So.3d 818, 822 (La.App. 5 Cir. 2014); *Meyer & Associates, Inc. v. Coushatta Tribe of Louisiana*, 185 So.3d 222, 246 (La.App. 3 Cir. 2016). A failure to perform an obligation "results from nonperformance, defective performance, or delay in performance." La. Civ. Code art. 1994. As noted, in their opposition brief, plaintiffs contend the filing of a suit for rescission constitutes delayed performance.

While plaintiffs' complaint states the filing of the suit for rescission was "*intended* to breach the settlement agreement," and was "*intended* to rescind the contract," plaintiffs never affirmatively state any payments under the contract were delayed.[26] Similarly, in their opposition brief, plaintiffs state defendants "attempted to rescind the settlement contract" and sought "to cut off the settlement's funding," but never affirmatively state any payments under the settlement contract were delayed. As plaintiffs have failed to plead an essential element of their claim, the Court finds plaintiffs have failed to state a claim for breach of contract.

### E.   Punitive Damages

In their complaint, plaintiffs contend they are entitled to an award of punitive damages under the general maritime law, because Lloyds "acted in bad faith, with callous disregard and indifference, and have been gross [sic] wilful and wanton in seeking to upset a Jones Act Settlement and seeking to rescind the judgment of a federal court sitting in admiralty without just cause and with full

---

[25]"Failure to perform" is the civilian counterpart to "breach." La. Civ. Code art. 1994, cmt (b).

[26]Indeed, the Schonekas Parties contend in their reply brief that "Plaintiffs admit in their Complaints that no annuity payments were ever stopped." [Doc. 82, p.7] The Court has been unable to locate any such admission in the hundreds of pages of pleadings filed by plaintiffs in this case.

knowledge of the falsity of many allegations made toward the Plaintiff." [Doc. 1, ¶ 228]

Lloyds contends the settlement agreement is not a maritime contract, but even if it were, punitive damages are not available for a breach of contract claim under maritime law, unless "the conduct which constitutes the breach is also a tort for which punitive damages are recoverable." [Doc. 68-1, pp. 26-27 (citing *Ryan Marine Servs. v. Hudson Drydocks, Inc.*, 2011 WL 6209801, *4 (W.D.La. 2011)] Plaintiffs contend "Lloyds' conduct in breaching the Jones Act Settlement was coupled with highly malicious conduct in the form of the torts of defamation and intentional infliction of emotional distress," and "[a]ccordingly, Plaintiff have stated a claim for punitive damages under maritime law." [Doc. 73, p. 9]

Plaintiffs have not shown punitive damages are available for their claims of defamation or intentional infliction of emotional distress. Therefore, even if maritime law applies to the Jones Act settlement, plaintiffs have failed to state a claim for punitive damages.

F.    **Sanctions**

Lloyds seeks dismissal of plaintiffs' claim for sanctions. In the complaint, plaintiffs argue this Court should use its "inherent power" and sanction Lloyds for its "bad faith conduct in the Cal Dive Suit." [Doc. 1, ¶¶ 219, 221] The sanctions sought by plaintiffs include, but are not limited to, "reimbursement of all of plaintiffs' litigation expenses, including attorney's fees and costs, incurred defending the Cal Dive Suit, as well as those incurred in bring the present action, with interest." [Id. at ¶ 224] In their opposition brief, plaintiffs note Lloyds asked for sanctions in the Cal Dive suit, and state, "if sanctions were available to Lloyds in its case, they should likewise be available to Plaintiffs in this matter, given Lloyds' conduct as alleged in Plaintiffs' Complaints." [Doc. 73, p. 10] No other factual argument is made for the imposition of sanctions.

For all of the reasons previously discussed, the Court finds nothing in the pleadings filed herein warrants the imposition of sanctions.

## IV. Conclusion

In light of the above, the motion to dismiss [Doc. No. 66] submitted by the Shonekas Parties, and the motion to dismiss [Doc. No. 68] submitted by Lloyds are GRANTED, and all claims asserted herein are DISMISSED WITHOUT PREJUDICE.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _____ 6th _____ day of _March_, 2017.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE